UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHRISTINA HAEGELE,

    Plaintiff,

v.                            Case No. 8:19-cv-2750-T-33CPT

GRADY JUDD, et al.,

    Defendants.
_____/

**ORDER**

This matter comes before the Court upon consideration of Defendants Sheriff Grady Judd, Reginald Green, and Joseph Hicks' Motion in Limine to Exclude Testimony of Charles Boswell (Doc. # 100), filed on October 21, 2020. Plaintiff Christina Haegele, individually and as personal representative of the estate of Chance Haegele, responded on November 4, 2020. (Doc. # 107). Defendants replied on November 16, 2020. (Doc. # 110). The Motion is granted.

**I.   Background**

This is a Section 1983 and wrongful death case filed by Haegele, as personal representative of the estate of her deceased son, who was shot and killed by two Polk County Sheriff deputies — Green and Hicks — near his home on March 20, 2018. (Doc. # 22). Haegele initiated this action on

1

November 15, 2019 (Doc. # 1), and the case has proceeded through discovery.

Haegele intends to rely on her expert Charles Boswell's testimony at trial. In his report, Boswell concludes — based on the placement of Green's shell casings at the scene of the shooting — that Green "was advancing on Chance as Chance remained stationary at the base of [a] bush" at the scene. (Doc. # 100-1 at 8). He maintains that "Chance did not emerge from the bush." (Id.). Based upon the ejection pattern of Hicks's shell casings, Boswell concludes that Hicks was stationary and "that he shot into the bush at a target which per his admission he could not see nor could he verify was armed." (Id.). Additionally, Boswell opines that the crime scene technician's admittedly not-to-scale diagram misrepresents the measurements from the scene of the shooting because the diagram gives the impression "that Chance exited from the bush, traveled northwest, and was [in] very close proximity of [] Green who was stationary and within feet just south of Chance." (Id. at 7).

In a Rule 26 disclosure, Boswell states that he has "not testified as an expert witness in the last 4 years other than in [his] capacity as a law enforcement officer with the Hillsborough County Sheriff's Department." (Doc. # 100-2).

2

Boswell does "not have any publications relevant" and is charging $275 per hour. (Id.). The parties took Boswell's deposition. (Doc. # 100-3).

Now, Defendants seek to exclude Boswell's testimony. (Doc. # 100). Haegele has responded (Doc. # 107), and Defendants have replied. (Doc. # 110). The Motion is ripe for review.

## II. Discussion

### A. Expert Affidavit

As a preliminary matter, the Court will not consider the affidavit of Boswell attached to Haegele's response to the Motion. (Doc. # 107-1). This affidavit is an untimely and impermissible attempt to supplement Boswell's reports with additional opinions and greater explanations for the opinions described in his original reports.

"An expert report may be supplemented, pursuant to Rule 26(e), when the party learns that the original disclosure was incomplete or incorrect, but may not be supplemented in order to cure a major omission or to remedy an expert's inadequate or incomplete preparation." Lincoln Rock, LLC v. City of Tampa, No. 8:15-cv-1374-T-30JSS, 2016 WL 6818959, at *4 (M.D. Fla. Nov. 18, 2016). "[A] party cannot abuse Rule 26(e) to merely bolster a defective or problematic expert witness

3

report." Companhia Energetica Potiguar v. Caterpillar Inc., No. 14-CV-24277, 2016 WL 3102225, at *6 (S.D. Fla. June 2, 2016).

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "Courts have broad discretion to exclude untimely-disclosed expert witness testimony — even when they are designated as 'supplemental' reports." Companhia Energetica Potiguar, 2016 WL 3102225, at *5.

Here, Boswell's affidavit was made directly in response to the arguments in the instant Motion and, thus, was disclosed long after the expert reports deadline and discovery deadline had passed. See Id. at *7 (declining to consider "untimely-provided supplemental expert report" submitted "after [defendant] filed its summary judgment and Daubert motions" in an attempt to "respon[d] to the argument that [the expert] inspected the wrong product"). Boswell's affidavit adds information about his qualifications and experience and clarifies his opinions — all of which he could have done in his original report. See Lincoln Rock, LLC, 2016

4

WL 6818959, at *6 (striking an expert's declaration filed in response to a Daubert motion as "an untimely supplemental report" because it "add[ed] additional layers of analysis, research, and background which were available to him at the time that he served his Initial Report").

Furthermore, the Court agrees with Defendants that allowing the untimely affidavit would cause them to "suffer prejudice" because they "lack[] opportunity to conduct further discovery to defend against opinions that could have been timely disclosed." (Doc. # 110 at 3); see Lincoln Rock, LLC, 2016 WL 6818959, at *6 ("[A]ny supplementation at this late stage is highly prejudicial to the [defendant]."). Thus, Boswell's affidavit is stricken as an untimely supplemental report.

### B. Daubert Analysis

Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

5

Implementing Rule 702, <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), requires district courts to ensure that any and all scientific testimony or evidence admitted is both relevant and reliable. <u>See</u> <u>Id.</u> at 589–90. The <u>Daubert</u> analysis also applies to non-scientific expert testimony. <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 147 (1999). District courts must conduct this gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony.'" <u>Rink v. Cheminova, Inc.</u>, 400 F.3d 1286, 1291 (11th Cir. 2005).

The Eleventh Circuit "requires trial courts acting as gatekeepers to engage in a 'rigorous three-part inquiry.'" <u>Hendrix v. Evenflo Co.</u>, 609 F.3d 1183, 1194 (11th Cir. 2010). The district court must assess whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

<u>Id.</u> The proponent of the expert testimony bears the burden of showing, by a preponderance of the evidence, that the

6

testimony satisfies each of these requirements. Id. The Court will address each aspect of the three-part inquiry below.

### 1. Qualifications

The first question under Daubert is whether the proposed expert witness, Charles Boswell, is qualified to testify competently regarding the matters he intends to address. City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 563 (11th Cir. 1998). An expert may be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "Determining whether a witness is qualified to testify as an expert 'requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony.'" Clena Invs., Inc. v. XL Specialty Ins. Co., 280 F.R.D. 653, 661 (S.D. Fla. 2012)(quoting Jack v. Glaxo Wellcome, Inc., 239 F. Supp. 2d 1308, 1314–16 (N.D. Ga. 2002)).

"This inquiry is not stringent, and so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." Id. (citations and internal quotation marks omitted). The Court is mindful that its "gatekeeper role under Daubert 'is not intended to supplant the adversary system or the role of the jury.'" Maiz v. Virani, 253 F.3d 641, 666

(11th Cir. 2001)(quoting <u>Allison v. McGhan</u>, 184 F.3d 1300, 1311 (11th Cir. 1999)).

    Defendants argue that Boswell is not qualified to testify as an expert because, in the Rule 26 disclosure (Doc. # 100-2), he disclosed "no education history, no professional licensing or certification, and no professional society membership." (Doc. # 100 at 5). Additionally, Boswell has not testified as an expert witness in the last four years and he provides no information about his earlier work as an expert. (<u>Id.</u>). As for work experience, Boswell's Rule 26 disclosure at most indicates that he was an officer with the Hillsborough County Sheriff's Department at some recent time. (<u>Id.</u>).

    Defendants ignore, however, that Boswell provided greater detail about his education and professional history in his deposition. Specifically, he explained that has a bachelor's degree in criminal justice and a master's degree in criminal justice with a concentration in forensic science from St. Leo University. (Doc. # 100-3 at 7:6-14). Boswell also stated that he worked for the Hillsborough County Sheriff's Office from 1991 to 2017, where he served for many years as a detective in the major crimes division. (<u>Id.</u> at 6:7-16).

In light of this education and experience, as well as Defendants' limited argument on the issue of qualifications, the Court finds that Boswell meets the lenient qualifications standard.

### 2. Reliability

The next question is whether Boswell's methodology is reliable. "Exactly *how* reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial." United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004)(citing Fed. R. Evid. 702, Advisory Committee Notes (2000)). There are four recognized, yet non-exhaustive, factors a district court may consider in evaluating reliability:

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community.

Seamon v. Remington Arms Co., 813 F.3d 983, 988 (11th Cir. 2016)(citations omitted). A district court can take other relevant factors into account as well. Id. (citations omitted).

"Although an opinion from a non-scientific expert should receive the same level of scrutiny as an opinion from an expert who is a scientist, some types of expert testimony will not naturally rely on anything akin to the scientific method, and thus should be evaluated by other principles pertinent to the particular area of expertise." Washington v. City of Waldo, Fla., No. 1:15CV73-MW/GRJ, 2016 WL 3545909, at *3 (N.D. Fla. Mar. 1, 2016)(citing Fed. R. Evid. 702, Advisory Committee Notes (2000)). Still, "[i]f the [expert] witness is relying solely or primarily on experience, then," in establishing reliability, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Frazier, 387 F.3d at 1261 (citation and internal quotation marks omitted). The Court's analysis as to reliability "focus[es] 'solely on principles and methodology, not on the conclusions that they generate.'" Seamon, 813 F.3d at 988 (citation omitted).

Defendants challenge Boswell's methodology in "reconstructing" the crime scene and evaluating the reliability of the crime scene diagram prepared by the Sheriff's Office's forensics technician. (Doc. # 100 at 6).

10

They also challenge Boswell's methodology regarding his opinions about the shell casings and Hicks and Green's alleged movement during the shooting based on the shell casings, as well as Chance's location before and during the shooting. (Id. at 7-10). The only sentence regarding methodology in Boswell's report is as follows: "[Boswell] inspected and reconstructed the incident scene via triangulation by utilizing the measurements provided by CSI Kistler." (Doc. # 100-1 at 7).

In his deposition, Boswell explained that he personally visited the scene of the shooting and confirmed the measurements taken by CSI Kistler. (Doc. # 100-3 at 10:24-12:4). He then reviewed whether the diagram created by CSI Kistler, which states openly that it is not to scale, "misrepresents" the crime scene. (Id. at 11:6-11, 32:5-18; Doc. # 100-1 at 7). After doing so, Boswell opined that, although CSI Kistler's measurements of the scene were "indeed accurate," they "were not properly represented in her diagram." (Doc. # 100-1 at 7). For example, despite the measurements "plac[ing] Chance's feet at the base of the bush," the diagram "depict[s] Chance's final resting point" as "northwest of the bush." (Id.). According to Boswell, the diagram's depiction of the shell casings suggests that "Green

11

was stationary at the time of the shooting," but Boswell believes the measurements of the shell casings support that Green "was advancing on Chance" while shooting. (Id. at 8). Boswell opined that the diagram's depiction of Hicks's shell casings is an accurate representation of the actual measurements. (Id.). Based on these measurements of the shell casings' locations, Boswell opines that Hicks "was stationary" and "simply fired into the bush at an unknown target in response to [] Green's gunfire." (Id.).

The Court agrees with Defendants that much of Boswell's methodology is unreliable. First, Boswell's methodology for estimating Hicks and Green's positions based on the shell casings is unreliable. Boswell did not test Hicks and Green's firearms — or even the same type of firearms — to determine the distance shell casings are typically ejected from those weapons. Nor has Boswell referred to any literature regarding the reliability of the testing of shell casing ejection patterns. See United States v. Fultz, 18 F. Supp. 3d 748, 757–58 (E.D. Va. 2014)(excluding firearms and shooting scene reconstruction expert's testimony because the expert "did not indicate at trial whether a method for determining the origin of a gunshot from the location of spent casings has been (or can be) tested, nor did he indicate whether such a method has

been subjected to peer review and publication," failed to identify "any literature supporting the theory that one could determine the origin of a shot based on the location of shell casings at a crime scene," and failed to address "the known or potential error rate of [his] chosen method of determining shooter location"). Furthermore, there is no information regarding Boswell's methodology in determining Hicks and Green's supposed movement while shooting based on the shell casings.

Thus, the Court concludes that Boswell's testimony regarding the shell casings and the supposed meaning of their placement is unreliable. See <u>Mighty v. Miami-Dade County</u>, No. 14-23285-CIV, 2019 WL 4306942, at *5 (S.D. Fla. Aug. 9, 2019)(finding an expert's methodology in conducting an "ejection pattern analysis to reach his conclusion regarding the location of Officer Carballosa when he fired his weapon" unreliable where the expert had done testing — actually shooting the weapon at issue and measuring how the shell casings fell — but could not explain the reliability of this testing method or "point to any literature that explains the circumstances when offhand shooting is a reliable methodology"), <u>report and recommendation adopted</u>, No. 14-23285-CIV, 2019 WL 4305847 (S.D. Fla. Sept. 10, 2019). Thus,

13

Boswell may not testify on Hicks and Green's supposed positions or movements based on the shell casings.

Nor may Boswell opine as to whether Chance "lunged" from the bush or "crouched in the bush" before and during the shooting. Boswell's methodology involved reviewing the crime scene measurements taken by CSI Kistler. (Doc. # 100-1 at 7). But CSI Kistler took her measurements of the scene after the shooting and after medical aid had been performed on Chance, which likely resulted in the movement of Chance's body to some degree. Boswell has not presented a reliable methodology for determining where Chance was located and how he was behaving before he was shot based on where his body ultimately fell and was given medical attention. For that reason, Boswell may not proffer his opinion on Chance's location or actions before and during the shooting. See Sanchez v. Jiles, No. CV1009384MMMOPX, 2012 WL 13005996, at *9 (C.D. Cal. June 14, 2012)("Clark identifies no source for his conclusions regarding the decedent's position at the time he was shot other than the autopsy report, and fails to demonstrate that his expertise in shooting scene reconstruction and investigative procedures permits him to draw reliable conclusions on that subject.").

However, Boswell's methodology of reviewing the crime scene measurements and comparing them to the crime scene diagram is reliable to the limited extent Boswell opines on how the diagram is not to scale with the measurements. That is, Boswell's testimony is reliable concerning the divergence between the diagram and the measurements themselves. So, for example, his opinion that the diagram did not accurately reflect Chance's final resting point because the measurements "place Chance's feet at the base of the bush" rather than "northwest of the bush as depicted in the diagram" is reliable.

### 3. Assistance to Trier of Fact

Expert testimony must also assist the trier of fact. Fed. R. Evid. 702. "By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." Frazier, 387 F.3d at 1262 (citation omitted). "[T]he court must 'ensure that the proposed expert testimony is "relevant to the task at hand," . . . i.e., that it logically advances a material aspect of the proposing party's case.'" Allison, 184 F.3d at 1312 (citation omitted).

So, while "[t]he 'basic standard of relevance . . . is a liberal one,' Daubert, 509 U.S. at 587, . . .[,] if an

expert opinion does not have a 'valid scientific connection to the pertinent inquiry[,]' it should be excluded because there is no 'fit.'" Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp., 582 F.3d 1227, 1232 (11th Cir. 2009)(citations omitted). "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262-63 (citation omitted).

Defendants argue that Boswell's testimony should also be excluded because it would not help the jury. (Doc. # 100 at 10-11). The Court need only address this argument as to Boswell's anticipated testimony that has not already been excluded. That is, Boswell's testimony regarding the specific ways that the crime scene diagram differs from the measurements of the crime scene.

Ultimately, the Court concludes that this testimony — although reliable — would not assist the jury. The crime scene diagram states that it is not to scale, so no testimony is needed to prevent the jury from assuming that the diagram is to scale. Furthermore, as Boswell acknowledged during his deposition, numerous photographs of the crime scene were taken. (Doc. # 100-3 at 32:20-33:7). These photographs will

16

enable the jury to understand the actual layout of the crime scene. Finally, the jury will have access to the crime scene measurements themselves, which Boswell admitted were accurate. (Doc. # 100-1 at 7).

In short, Boswell's testimony regarding the divergence between the crime scene measurements and the not-to-scale crime scene diagram will not assist the jury. This testimony is not beyond the understanding of a lay person. Thus, Boswell may not offer this testimony at trial.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

Defendants Sheriff Grady Judd, Reginald Green, and Joseph Hicks' Motion in Limine to Exclude Testimony of Charles Boswell (Doc. # 100) is **GRANTED**. The testimony of Mr. Boswell is excluded.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 23rd day of November, 2020.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE