UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHRISTINA HAEGELE,

    Plaintiff,

v.                              Case No. 8:19-cv-2750-T-33CPT

GRADY JUDD, et al.,

    Defendants.

_____/

## ORDER

    This matter comes before the Court upon consideration of Defendants Sheriff Grady Judd, Reginald Green, and Joseph Hicks' Motion for Summary Judgment (Doc. # 99), filed on October 21, 2020. Plaintiff Christina Haegele, individually and as personal representative of the estate of Chance Haegele, responded on November 18, 2020. (Doc. # 113). Sheriff Judd, Green, and Hicks replied on December 3, 2020. (Doc. # 118). Haegele filed a sur-reply on December 15, 2021. (Doc. # 126). The Motion is granted as set forth below.

## I.   Background

    Chance Haegele was a twenty-year old man with mental health issues, including bipolar disorder, schizophrenia, and depression. (Doc. # 99-9 at 74:4-12). He had been involuntarily committed under the Baker Act numerous times,

such that the Polk County Sheriff's Office was aware of his mental health issues. (Id. at 32:8-38:22; Doc. # 112-19; Doc. # 112-20; Doc. # 112-21).

On the night of March 20, 2018, the date of the shooting, Chance had been drinking alcohol he obtained from a neighbor. (Doc. # 99-9 at 50:17-51:20). He made social media posts that appeared suicidal in tone. (Doc. # 99-2 at 1-2). Specifically, he posted on Facebook, "I do not want to live." (Id. at 2). He also sent through a social media application a photo of himself with the following text: "Tell me why the fuck I shouldn't kill myself. Life is so fucking boring. I don't wanna work for the rest of my life. We are so irrelevant in the grand scheme of the universe. I'm never gonna fall in love again. Nobody wants a trailer boy." (Id. at 1).

An acquaintance of Chance's, Christian Morales, saw Chance's social media posts and called the Polk County Sheriff's Office. (Doc. # 99-3 at 7:12-8:9; Doc. # 99-4). Morales informed the Sheriff's Office operator that Chance had said that he had killed his mother — Plaintiff Christina Haegele (hereinafter, Haegele) — and wanted to kill himself. (Doc. # 99-4 at 2:5-9, 5:8-13, 6:1-11; Doc. # 99-3 at 8:18-9:11; Doc. # 99-5 at 1).

A Sheriff's Office operator called Chance about what Morales had said. (Doc. # 99-6). Chance denied having killed his mother or being suicidal. (Id.). Rather, Chance told the operator his apparently suicidal messages were about his disappointment over his poor performance during a video game. (Id.). The operator also spoke with Haegele to confirm she was alive. (Id.). The operator called a second time to ask Chance for his address. (Doc. # 99-7).

A Sheriff's Office operator then dispatched Deputy Adrin McGough to Chance's address. (Doc. # 99-5 at 2). Other deputies were dispatched to the scene as backup, including Deputy Hicks and Deputy Green. (Id.).

Haegele called 911 and advised the operator that Chance had taken her shotgun, that the shotgun didn't have any bullets in it, and that Chance wanted the cops to shoot him. (Doc. # 99-8 at 2:5-25; Doc. # 99-5 at 2; Doc. # 99-9 at 55:25-56:4). Indeed, Haegele testified that she told 911 that Chance had "got [her] shotgun" and "probably want[ed] [the police] to shoot him." (Doc. # 99-9 at 55:25-56:4). The 911 operator relayed this information to a Sheriff's Office operator. (Doc. # 99-8 at 2:2-3:4; Doc. # 99-5 at 2).

Deputy McGough arrived first out of the three, at which point Haegele approached him and stated that Chance had

removed a shotgun from her room. (Doc. # 99-10 at 7:20-8:10). According to Haegele, she told Deputy McGough that the gun was unloaded. (Doc. # 99-9 at 55:6-8). Deputy McGough took a protective shield from his patrol car and then saw Chance sitting in a neighbor's yard while holding the shotgun. (Doc. # 99-10 at 8:11-9:19). Deputy McGough saw Haegele run towards Chance. (Id. at 9:15-23).

Deputy Green arrived second out of the three, and grouped together with other deputies on scene when he arrived. (Doc. # 99-11 at 7:8-8:5). Someone said that they had seen Chance, at which point Deputy Green saw Chance and Haegele at the end of the road. (Id. at 8:6-8:16).

Deputy Hicks arrived last of the three, while the group of deputies, including McGough and Green, were already walking down the street towards a disturbance at the end of the road. (Doc. # 99-12 at 8:5-9:23).

At the end of the road, Haegele had approached Chance and attempted to wrestle the shotgun away from him. (Doc. # 99-11 at 8:6-9:4; Doc. # 99-10 at 9:20-23, 10:14-11:3; Doc. # 99-9 at 56:21-57:25, 83:5-21). Chance ultimately took control of the shotgun and fled with it. (Doc. # 99-11 at 8:18-9:20, 10:2-22; Doc. # 99-10 at 11:4-16, 11:25-12:7; Doc. # 99-9 at 57:10-19). According to Hicks, after the struggle,

4

Haegele told Deputy Hicks that she did not know if Chance had found the bullets for the shotgun. (Doc. # 99-12 at 10:4-9). But Haegele testified that, immediately after her struggle with Chance, she told an officer that the shotgun was unloaded. (Doc. # 99-9 at 57:19-23).

The deputies on scene began to search the surrounding residential area in pursuit of Chance. (Doc. # 99-10 at 12:13-20; Doc. # 99-12 at 10:4-10:13; Doc. # 99-11 at 9:17-20). At some point during the search, Deputies Green and Hicks decided to check in-between the residences together. (Doc. # 99-12 at 12:11-13:4; Doc. # 99-11 at 14:2-20). Deputies Green and Hicks walked in-between the residences, working their way back to where Chance had fought with Haegele over the shotgun. (Doc. # 99-12 at 13:5-10; Doc. # 99-11 at 14:20-25).

While Chance was fleeing from the officers after the struggle, Chance sent two pictures of himself through a social media application: one shows Chance armed with a shotgun and is captioned "Coming after me with ARs"; the other is captioned "They're gonna take me away tonight." (Doc. # 99-2 at 3-4; Doc. # 99-13 at 27:19-29:23).

While the deputies were searching for Chance, Haegele called her nephew, Scott Staten, Jr., who recorded their phone conversation. (Doc. # 99-14 at 13:1-9, 13:24-14:11; Doc. #

99-15). On that call, Haegele stated that Chance "beat [her] up", "kicked [her] in [her] fucking ribs", and "fucked up [her] arm and . . . kicked [her] in the ribs." (Doc. # 99-15 at 4:10, 12-13, 5:5-6). Also, when asked whether the shotgun had bullets, Haegele first responded, "No, I never let him know where the bullets were" but then stated, "Yeah, but you know what? Who knows if he did find them, you know what I mean?" (Id. at 5:23-6:4).

While working their way back in-between the residences, Deputies Green and Hicks encountered Chance standing next to a shed and a bush tall enough to obscure Chance's face next to that shed. (Doc. # 99-11 at 17:6-18:3, 18:17-22, 19:5-8; Doc. # 99-12 at 37:18-38:9, 38:21-39:12). Deputy Green testified that Chance was standing with his back to the shed and had his head turned to the left. (Doc. # 99-11 at 17:15-18:11). He further testified that, at this time, Chance was holding the shotgun pointed towards the ground. (Id. at 18:14-16).

Upon seeing Chance with the shotgun, Deputy Green issued repeated verbal commands to "Put it down. Put it down. Don't move." (Doc. # 99-12 at 13:23-14:3; Doc. # 99-11 at 19:1-4). Deputy Hicks testified that, when Deputy Green began to issue verbal commands and Chance began to move out of the bush,

6

Deputy Hicks moved towards Deputy Green and saw Chance. (Doc. # 99-12 at 15:24-16:4, 16:20-17:4, 19:22-20:3, 22:20-24, 38:21-39:12, 39:20-40:4). Both deputies testified that, instead of putting down the shotgun, Chance turned his head toward Deputy Green and stepped out from behind the bush, away from the shed, and toward Deputy Green. (Doc. # 99-11 at 17:5-14, 18:23-25, 19:5-8; Doc. # 99-12 at 20:4-15, 26:10-24, 38:15-20). Deputy Green was standing in front of Chance with Chance facing him directly. (Doc. # 99-11 at 19:22-20:5).

According to Deputy Green, Chance raised the shotgun up from its lowered position and pointed the shotgun at him. (Id. at 17:5-14, 18:23-18:25). Deputy Hicks likewise testified that, when he saw Chance move out of the bush toward Deputy Green, he saw that Chance had "something long and black" in his hand that "came up" as Chance "lunged" toward Deputy Green. (Doc. # 99-12 at 20:5-22, 26:20-24). And, in his interview after the shooting, Deputy Hicks stated that when Chance "emerged from the bushes" Chance "had something in his hand," but Deputy Hicks did not see clearly that it was a shotgun until later. (Doc. # 112-14 at 183-184).

As Chance was moving toward Deputy Green and beginning to raise the shotgun, Deputy Green testified that he continued

7

to give verbal commands to Chance. (Doc. # 99-11 at 19:12-16, 19:22-20:9). Chance continued moving toward Deputy Green and raising the shotgun. (Doc. # 99-11 at 18:23-25, 19:12-16; Doc. # 99-12 at 20:16-21:5).

Once Chance had aimed the shotgun at Deputy Green, both Deputies Green and Hicks were "in well-founded fear for [their] safety and the safety of others." (Doc. # 99-17 at 6-7; Doc. # 99-12 at 27:21-28:9). Deputy Green stated in his interview after the shooting that he thought "it was over and he was going to get shot." (Doc. # 99-17 at 6). Both Deputy Green and Deputy Hicks discharged their firearms at Chance. (Doc. # 99-11 at 19:20-21, 21:1-4, 22:1-6; Doc. # 99-12 at 21:13-18). Although Deputy Hicks testified in his deposition that he did not know who fired first (Doc. # 99-12 at 19:20-21), he said during his interview on the night of the shooting that Deputy Green fired first. (Doc. # 112-14 at 181). Deputy Green fired twelve shots, and Deputy Hicks fired five shots. (Id. at 30). Chance ultimately died from his wounds. (Doc. # 112-13 at 9).

Deputies Hicks and Green were not the only surviving witnesses to the shooting. A resident of the neighborhood, Jacqueline Walsh, watched the shooting from her bedroom

8

window. (Doc. # 99-16 at 15:13-16, 16:13-22, 19:6-9, 32:25-33:11). When asked what she saw, Walsh testified:

> A:   I saw Chance stand there with the gun and the officers that were right outside the window asking him to put the weapon down. They told him three or four times to put the weapon down, and he did not. He picked up the weapon, aiming it at them, and they opened fire.
>
> Q:   I heard you say that Chance was standing there. Was he standing?
>
> A:   Yes, he was standing.
>
> Q:   He wasn't crouching or lying on the ground or sitting down?
>
> A:   No, sir, he was standing.
>
> Q:   What did Chance do with the gun in his hand?
>
> A:   He raised it and pointed it at the officers.

(Id. at 16:13-17:7).

Ultimately, the investigation revealed that the shotgun was, in fact, unloaded. (Doc. # 112-14 at 33). The autopsy report explains that Chance was struck nine times and includes details of each gunshot wound. (Doc. # 112-13). As numbered by the autopsy report, bullet 1 entered Chance's right upper back and the "direction of the wound path with respect to the standard anatomic position is to the left, downward and back to front." (Id. at 3). Bullet 2 entered Chance's left upper back and the "direction of the wound path with respect to the standard anatomic position is to the left and back to front."

(<u>Id.</u> at 4). Bullet 3 entered Chance's right upper back and the "direction of the wound path with respect to the standard anatomic position is to the left and downward." (<u>Id.</u>). Bullet 4 grazed Chance's left upper back. (<u>Id.</u>). Bullet 5 entered Chance's left lower torso and the "direction of the wound path with respect to the standard anatomic position is to the left." (<u>Id.</u> at 4-5). Bullet 6 entered Chance's right buttock and the "direction of the wound path with respect to the standard anatomic position is to the right, downward and back to front." (<u>Id.</u> at 5). Bullet 7 entered "the anterior aspect of the right thigh" and the "direction of the wound path with respect to the standard anatomic position is to the right and front to back." (<u>Id.</u>). Bullet 8 entered "the anterolateral aspect of the left thigh" and the "direction of the wound path with respect to the standard anatomic position is to the right." (<u>Id.</u> at 5-6). Finally, bullet 9 entered the "posteromedial aspect of the left thigh" and the "direction of the wound path with respect to the standard anatomic position is to the left, downward and back to front." (<u>Id.</u> at 6).

The medical examiner who performed the autopsy, Dr. Vera Volnikh, explained that the standard anatomic position is when a person is "standing straight up with the palm of [his]

hands in the front." (Doc. # 112-8 at 7:1-6). She testified
that "nobody ever is [in] that anatomic position when they
get shot." (Id. at 7:5-6).

Before performing the autopsy, Dr. Volnikh had been
provided a brief summary of the shooting by the Polk County
Sheriff's Office, which stated that Chance had pointed a
shotgun at a deputy and the deputy fired on Chance. (Id. at
19:3-19). When she was asked whether her autopsy findings
gave her "any reason to question" the summary she received,
Dr. Volnikh responded:

> Not really, because he has some of the wounds in
> the – in the front of the leg, especially in front
> of the leg, and then I guess he's turning and he
> has on the side and some of in the back. So, no, I
> didn't have any reason to believe that that's
> something that it's not the way that they describe
> it to me.

(Id. at 22:25-23:10).

When she was asked whether the gunshot wounds were
"consistent with crouching," Dr. Volnikh testified "It[]
could be crouching. It[] could be bending. I am not sure if
it's just crouching." (Id. at 26:5-13). And, when she was
asked whether any of the bullet wounds in Chance's back ended
with an exit wound out the front of the chest, she responded:

> A:   We have the bullet that[] [goes] lateral. It's
> go from right to left and back to front, but, again,
> it's kind of laterally they go, but no exit. I don't

11

believe there's exit in the front. We have two bullets — **no, there's no exit in the front.** From these three wound in the back you're talking about?

Q:   Yes.

A:   No. We have two bullets and one grazed wound, which is just graze the skin, you know, right to left. And the other will go from right to left too. One go just under the skin, kind of hitting the wing bone. The other is going kind of back to front, but also to the left. **So they all come from right to left. So mostly he — wherever his left side is exposed to the deputy and they're firing at some point, because some of the wound, like I say, it's anterior or on the left, which is lateral.**

(Id. at 25:7-23)(emphasis added).

After the shooting, Sheriff Judd held a press conference during which he stated that "Deputies did what they should have done. . . . We weren't able to stop an unfortunate set of events." (Doc. # 112-23 at 24). A news article reflects that Sheriff Judd has made statements in support of deputies involved in other shootings. (Doc. # 112-25). For example, Sheriff Judd is quoted as saying "We don't choose to shoot people, people choose for us to shoot them. . . . We're distraught for the family as well. But the bottom line is we go home at the end of our shift, and if people decide to attack us, beat us, try to take guns, we're going to shoot ya." (Id. at 9).

Ultimately, neither Green nor Hicks were disciplined for the shooting. (Doc. # 112-24 at 16:16-20).

Haegele, individually and on behalf of Chance's Estate, initiated this case on November 5, 2019. (Doc. # 1). Haegele's second amended complaint contains the following counts: wrongful death pursuant to Florida Statute § 768.16 et seq. (the Florida Wrongful Death Act, the "FWDA") against (I) Sheriff Judd, (II) Green, and (III) Hicks; and 42 U.S.C. § 1983 excessive force claims against (IV) Sheriff Judd, (V) Green, and (VI) Hicks. (Doc. # 44).

Defendants seeks entry of summary judgment on all claims. (Doc. # 99). Haegele has responded (Doc. # 113), and Defendants have replied. (Doc. # 118). With the Court's permission, Haegele has filed a sur-reply. (Doc. # 126). The Motion is ripe for review.

## II.  <u>Legal Standard</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344

F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. **Analysis**

### A. **Section 1983 Claims against Deputies**

Deputies Green and Hicks argue that they are entitled to qualified immunity for the Section 1983 excessive force claims against them. (Doc. # 99 at 9-19).

"Qualified immunity affords complete protection to government officials sued individually," Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012), except in cases where "the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the

circumstances." Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002). Qualified immunity "protect[s] from suit 'all but the plainly incompetent or one who is knowingly violating the federal law.'" Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)(quoting Willingham v. Loughnan, 261 F.3d 1178, 1187 (11th Cir. 2001)).

In order to establish a defense of qualified immunity, a government official must first demonstrate that he or she was acting within his or her discretionary authority. See Dalrymple v. Reno, 334 F.3d 991, 995 (11th Cir. 2003). Haegele does not appear to challenge that Hicks and Green were acting in their discretionary authority at the time of the shooting. (Doc. # 113 at 12-13).

"Once the defendants establish that they were acting within their discretionary authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate." Lumley v. City of Dade City, 327 F.3d 1186, 1194 (11th Cir. 2003). The Court follows a two-part analysis in determining whether qualified immunity applies. Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). The first part asks "whether [the] plaintiff's allegations, if true, establish a constitutional violation." Id. (quoting Hope v. Pelzer, 536 U.S. 730, 736 (2002)(internal quotation marks

16

omitted)). The second part asks "whether the right was clearly established." Id. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)(internal quotation marks omitted)). "Both elements . . . must be satisfied for an official to lose qualified immunity." Grider v. City of Auburn, 618 F.3d 1240, 1254 (11th Cir. 2010).

Haegele "must establish qualified immunity is not appropriate because the facts when viewed in the light most favorable to [her] show that [Deputies Hicks and Green] violated a constitutional right." Benson v. Gordon Cnty., 479 F. App'x 315, 317 (11th Cir. 2012)(citing Mercado v. City of Orlando, 407 F.3d 1152, 1156 (11th Cir. 2005)). "At summary judgment, [the Court] cannot simply accept the officer's subjective version of events, but rather must reconstruct the event in the light most favorable to the non-moving party and determine whether the officer's use of force was excessive under those circumstances." Fils v. City of Aventura, 647 F.3d 1272, 1288 (11th Cir. 2011)(citing Vinyard, 311 F.3d at 1347–48 as "evaluating, at summary judgment, the allegedly excessive force under the facts as described by the plaintiff, notwithstanding the defendant-officer's different version of events").

Although "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion," it remains that "[t]he Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." Lee, 284 F.3d at 1197. "The inquiry into whether this right was violated requires a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Tolan v. Cotton, 134 S. Ct. 1861, 1865-66 (2015)(internal citation and quotation marks omitted).

In determining reasonableness, a court "look[s] at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance[s] the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." McCullough v. Antolini, 559 F.3d 1201, 1206 (11th Cir. 2009)(citation omitted). The reasonableness of the force used "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)). A court's "calculus of reasonableness must embody

18

allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." Id. (quoting Graham, 490 U.S. at 396-97 (internal quotation marks omitted)).

Courts evaluate several factors, such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1305-06 (11th Cir. 2009)(quoting Graham, 490 U.S. at 396). Other factors include "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." Vinyard, 311 F.3d at 1347 (quoting Lee, 284 F.3d at 1197-98). The need-for-force criterion "is measured by the severity of the crime, the danger to the officer, and the risk of flight." Lee, 284 F.3d at 1198. "And in deadly force cases we are to determine whether the officer had probable cause to believe that the suspect posed a threat of 'serious physical harm' to the officer or others, and whether the officer had given the suspect a warning about the use of deadly force, if doing so

was feasible." <u>Cantu v. City of Dothan</u>, 974 F.3d 1217, 1229
(11th Cir. 2020). "Not all of the factors are relevant to all
excessive force cases." <u>Id.</u>

Here, Haegele has not established a constitutional
violation. Taking all the facts in the light most favorable
to Haegele, Chance was standing and raising the shotgun at
Deputy Green when Deputies Green and Hicks fired at him,
resulting in his death.

The evidence from the autopsy report and Dr. Volnikh's
deposition do not create a genuine issue of material fact
regarding whether Chance was "cowering" in the bush when he
was shot, as Haegele maintains. While certain entrance wounds
are on Chance's back, those wound paths were in a lateral
trajectory, meaning from Chance's side. (Doc. # 112-13). Dr.
Volnikh testified that these wounds "all come from right to
left" and suggested this had to do with Chance's side being
exposed to a deputy during the shooting. (Doc. # 112-8 at
25:7-23). And, while four of the nine wounds also have a
downward trajectory in relation to the standard anatomic
position, five wounds do not have a downward trajectory. (Doc.
# 112-13). Dr. Volnikh testified that the wounds with downward
trajectories could be consistent with "crouching" or
"bending." (Doc. # 112-8 at 26:5-13). But she also testified

20

that the autopsy results did not give her any reason to question the summary of the shooting she was given — that Chance stood and raised a shotgun at a deputy when he was shot — and noted a wound in the front of Chance's leg. (<u>Id.</u> at 22:25-23:10).

Nor do the select crime scene photographs submitted by Haegele — which she cited twice in passing but failed to actually discuss in her response (Doc. # 113 at 5, 9) — rebut the deputies' testimony, as Haegele now claims in her sur-reply. (Doc. # 126 at 5-7). Sadly, these photos depict Chance's body lying on the ground near a bush with his feet near the base of the bush, which is in turn in front of a shed. (Doc. # 112-15). They do not suggest that Chance was crouched in between the bush and the shed during the shooting, rather than standing near the bush. In short, the autopsy report, Dr. Volnikh's testimony, and the select crime scene photographs do not raise a *genuine* issue of material fact about whether Chance was cowering and crouching in a bush during the shooting.

While Haegele has attempted to point out discrepancies between Deputy Hicks' interview on the night of the shooting and his deposition, the Court does not find the two versions of events inconsistent. Regardless, even disregarding Deputy

Hicks' statements and testimony, there is still the sworn testimony of two witnesses — Deputy Green and Ms. Walsh — that Chance was standing and facing deputies at the time of the shooting. (Doc. # 99-11 at 17:5-19:21; Doc. # 99-16 at 16:13-17:7). Furthermore, both testified that, despite commands to drop the weapon, Chance raised the shotgun before Deputies Green and Hicks fired. (Doc. # 99-11 at 17:5-14, 18:23-18:25; Doc. # 99-16 at 16:13-17:7).

In short, the deputies here had witnessed Chance engage in a forceful struggle with Haegele for the shotgun, then flee through a residential neighborhood. When Deputies Green and Hicks did encounter him, he refused to comply with orders to drop the shotgun and actually raised the shotgun at Deputy Green.

Under these circumstances, Deputies Green and Hicks reasonably feared for their safety and the safety of others in the area. Shooting Chance — an armed man who threatened law enforcement with a deadly weapon — was not a violation of the Fourth Amendment. See Garczynski v. Bradshaw, 573 F.3d 1158, 1168 (11th Cir. 2009)("[T]he escalation into deadly force was justified by Garczynski's refusal to comply with the officers' commands. After identifying themselves, the officers repeatedly ordered Garczynski to show his hands.

They also repeatedly commanded him to drop the phone and then, after he raised a gun to his head, to drop his gun. Instead of obeying these commands, Garczynski swung the gun from his head in the direction of the officers, at which point they fired. The officers reasonably reacted to what they perceived as an immediate threat of serious harm to themselves."); Montoute v. Carr, 114 F.3d 181, 185 (11th Cir. 1997)("At least where orders to drop the weapon have gone unheeded, an officer is not required to wait until an armed and dangerous felon has drawn a bead on the officer or others before using deadly force."). Nor was it excessive force for the deputies to shoot Chance nine times to dispel the threat. See Jean-Baptiste v. Gutierrez, 627 F.3d 816, 821-22 (11th Cir. 2010)("A police officer is entitled to continue his use of force until a suspect thought to be armed is 'fully secured.'" (citation omitted)).

Additionally, that Haegele had informed deputies that Chance's shotgun was unloaded does not change the result. The deputies were not required to take Haegele's word for it and wait for Chance to fire on them before using deadly force. See Id. at 821 ("[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."

(quoting Long v. Slaton, 508 F.3d 576, 581 (11th Cir. 2007))). The reasonableness of the deputies' decision not to treat the shotgun as unloaded is underscored by the fact that, despite her representations to deputies, Haegele herself was unsure if the shotgun was loaded. (Doc. # 99-15 at 5:23-6:4). Again, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97. While the fact that the shotgun was unloaded renders Chance's death all the more tragic, it does not support that Deputies Green and Hicks acted unreasonably when they fired their weapons.

Similarly, Chance's mental health struggles and suicidal ideation do not convert Deputies Green and Hicks' actions into a constitutional violation. See Shaw v. City of Selma, 884 F.3d 1093, 1101 (11th Cir. 2018)("The shooting of a mentally ill man was tragic, as such shootings always are, but tragedy does not equate with unreasonableness."); Garczynski, 573 F.3d at 1170 (11th Cir. 2009)(affirming qualified immunity for officers who fatally shot a suicidal man).

24

Because there was no constitutional violation, Deputies Green and Hicks are entitled to qualified immunity for the Section 1983 claims against them, Counts V and VI. The Motion is granted as to these counts.

### B.  **Section 1983 Claim against Sheriff Judd**

It is well-established that "a municipality may not be held liable under [Section] 1983 solely because it employs a tortfeasor." Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 403 (1997). Rather, to recover damages from Sheriff Judd under Section 1983, Haegele must show: "(1) that [Chance's] constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir.2004)(citing City of Canton v. Harris, 489 U.S. 378, 388 (1989)).

Because the Court concludes that Deputies Green and Hicks did not violate Chance's constitutional rights, the Section 1983 custom or policy claim against Sheriff Judd fails. See Rooney v. Watson, 101 F.3d 1378, 1381 (11th Cir. 1996)("[A]n inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred. Since we have determined that Deputy Watson's

25

conduct did not cause the Rooneys to suffer a constitutional deprivation, we need not inquire into Volusia County's policy and custom relating to patrol vehicle operation and training."); see also Garczynski, 573 F.3d at 1170-71 ("Garczynski failed to show that any of the named individual police officers deprived him of his constitutional rights by using excessive or deadly force. Absent a constitutional violation, we need not explore whether PBSO's policies regarding crisis intervention training violated Garczynski's constitutional rights. Accordingly, we affirm summary judgment in favor of Sheriff Bradshaw."); Willis v. Mock, 600 F. App'x 679, 685 (11th Cir. 2015)("Here, neither Captain James nor Sergeant Turner violated Willis's constitutional rights. So Willis's claim against the City of Apalachicola fails. Accordingly, we conclude that the district court did not err in granting summary judgment to the city.").

Summary judgment is granted for Sheriff Judd on the Section 1983 claim against him, Count IV.

C.   **Wrongful Death Claims**

The Section 1983 claims provided the sole source of federal jurisdiction in this case, as the parties do not meet the requirements of diversity jurisdiction pursuant to 28 U.S.C. § 1332. Rather, the Court concludes that supplemental

jurisdiction pursuant to 28 U.S.C. § 1367 supplies the only remaining basis for jurisdiction over the FWDA claims.

"The dismissal of [a plaintiff's] underlying federal question claim does not deprive the [c]ourt of supplemental jurisdiction over the remaining state law claims." Baggett v. First Nat. Bank of Gainesville, 117 F.3d 1342, 1352 (11th Cir. 1997). "Indeed, under 28 U.S.C. § 1367(c), the Court has the discretion to decline to exercise supplemental jurisdiction over non-diverse state law claims, where the [c]ourt has dismissed all claims over which it had original jurisdiction, but [the court] is not required to dismiss the case." Id. Nevertheless, the Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." Raney v. Allstate Ins. Co., 370 F.3d 1086, 1089 (11th Cir. 2004).

The FWDA claims depend on determinations of state law. "[S]tate courts, not federal courts, should be the final arbiters of state law." Ingram v. School Bd. of Miami-Dade Cnty., 167 F. App'x 107, 108 (11th Cir. 2006). Furthermore, the Court finds that principles of judicial economy and comity weigh in favor of the Court declining to exercise supplemental jurisdiction over these claims.

Accordingly, because the Court grants Defendants' Motion for Summary Judgment with regard to the federal claims, and diversity jurisdiction does not exist, the Court in its discretion declines to exercise supplemental jurisdiction over the FWDA claims. See Nagy v. Taylor Cnty. Sch. Dist., No. 5:16-CV-70-MTT, 2017 WL 4448579, at *14 (M.D. Ga. Oct. 5, 2017)("[B]ecause Defendants are entitled to judgment as a matter of law on the federal law claims, the Court declines to exercise supplemental jurisdiction over the state law tort claims."). The FWDA claims, Counts I, II, and III, are dismissed without prejudice so they may be reasserted in state court.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)  Defendants Sheriff Grady Judd, Reginald Green, and Joseph Hicks' Motion for Summary Judgment (Doc. # 99) is **GRANTED** to the extent set forth herein.

(2)  The Florida Wrongful Death Act claims, Counts I, II, and III, are **DISMISSED WITHOUT PREJUDICE** so that they may be reasserted in state court.

(3)  The Clerk is directed to enter judgment in favor of Defendants and against Plaintiff Christina Haegele,

individually and as personal representative of the estate of Chance Haegele, for Counts IV, V, and VI.

(4)   Thereafter, the Clerk is directed to **CLOSE** the case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 29th day of December, 2020.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE